**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SUSAN SHIRO | Docket No. 2:20-mj-00100-JCN |

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Andrew Flynn, being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am employed as a Police Officer for the Scarborough Police Department, and I am currently assigned to the United States Drug Enforcement Administration as a Task Force Officer. I am a graduate of the 15th Basic Law Enforcement Training Program at the Maine Criminal Justice Academy. I have been a police officer for over 11 years. I have received in-service training to include drug related investigation training, such as interdiction and identification of illicit drugs and technology used against law enforcement. During my employment as a police officer, I have conducted several drug trafficking investigations, to include oxycodone, heroin, fentanyl and cocaine drug trafficking organizations. During that assignment, I conducted surveillance, performed interviews, executed search warrants, and processed drug related evidence.

2. Based on my training and experience as a DEA Task Force Officer and Police Officer, I have become familiar with the criminal activities of individuals involved in drug trafficking organizations, including drug manufacture and distribution, money laundering, and unlawful use/possession of firearms. I have also become familiar with the methods used by such

individuals to avoid detection by law enforcement, including the use of: multiple cellular telephones, including those subscribed to in the names of other persons; prepaid cellular telephones; counter-surveillance techniques; coded and ambiguous language; multiple vehicles; vehicles equipped with concealed compartments; and false identities.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.

4. In July of 2018, Scarborough Police Department began a special enforcement investigation into the residence at 6 Woodfield Drive (hereinafter "Woodfield") in Scarborough, Maine, after numerous complaints from neighbors were received into the police department about vehicles coming and going to the residence.

5. Woodfield is owned by Susan Shiro (hereinafter "Shiro") and is a three bedroom home in a residential neighborhood. Shiro's daughter Jamie Shiro (hereinafter "Jamie") resides at Woodfield with Shiro.

6. On August 8, 2018, a search warrant was executed at Woodfield for the search of R.T., a registered sex offender, who was residing at the location, but provided an address in Yarmouth, Maine. At the time the search warrant was executed, eight (8) individuals, excluding Jamie and Shiro, were observed residing at Woodfield. The eight (8) aforementioned individuals were known by law enforcement to have drug histories.

7. On November 22, 2018, a neighbor called the police department to report a suspicious vehicle in front of Woodfield and provided the registration. The registration came back to an individual with drug history. A second vehicle was run into the system yielding another individual with drug history. Scarborough officers responded to Woodfield and when they knocked on the door they overheard "[m]ake sure you step out and shut the door. Don't let them

come in the doorway." Jamie answered the door and informed officers she didn't know anything about the vehicle. Shortly after the encounter one of the individuals came out of the house and moved the car.

8.  On January 2, 2019, officers observed a vehicle pull into the driveway of Woodfield and observed T.Smith approach the vehicle and conduct a hand to hand exchange with the male operator of the vehicle, A.F. A.F.'s vehicle was subsequently stopped and fentanyl and Xanax were seized from the person of A.F. A.F. admitted to purchasing the drugs from T.Smith in the drive way of Woodfield.

9.  As a result of the purchase, a state search warrant was conducted for Woodfield. Inside of the residence, in the living quarters of T.Smith, 7.4 grams of fentanyl were recovered from inside of T.Smith's sock, 21.2 grams of fentanyl from inside a safe located in his living quarters, 10.3 grams of MCPP, 3.9 grams of marijuana, 2 suboxone strips, cutting agent, and $4,080.[1] Additionally, five (5) people, excluding Jamie and Shiro were observed to be residing at Woodfield.

10. Shiro arrived home while the search warrant was being conducted. An officer spoke with Shiro in regards to the ongoing drug problem at her residence and advised that she needed to remove the drug dealers and users from her home.

11. On the same day, another officer spoke with a former resident of Woodfield who stated he/she had been present for three (3) separate opiate overdoses at the location. He/she further stated Narcan had been administered each time and police nor emergency medical services were notified. He/she stated residents of Woodfield accosted and physically restrained him/her when he/she attempted to call police.

---

[1] T. Smith was charged federally for this incident and received credit for time served. He is currently on supervised release.

12. On January 3, 2019, officers sent an email to Shiro's email address with the federal statute for maintaining a drug premises. The officers further informed Shiro that she could not keep up the activity at the house and if she needed assistance in removing the individuals from her residence, they could provide aid. Officers also sent an article about a sentencing for the same charge from Bangor. Officers followed up the email with a phone call to Shiro to ensure she had received the email. Shiro understood.

13. On January 30, 2019, Shiro contacted the police department to report that a check was stolen out of her checkbook and named two individuals she believed stole it. Shiro also stated only her and Jamie were currently residing at Woodfield.

14. Approximately seven (7) days later a neighbor brought a letter addressed to the police station C.G. at Woodfield that was delivered to the wrong address. C.G. informed officers that C.G. never left Woodfield.

15. On February 11, 2019, officers conducted surveillance at Woodfield and observed a vehicle pull into the driveway. They overheard some banging and a male voice ask "did you get in?" Officers were aware that Shiro and Jamie were at the hospital due to an incident the evening before and contacted Shiro to inform her that there were individuals trying to get into Woodfield. Shiro believed it was C.G. Officers overheard Shiro ask Jamie if it was okay for the officers to go into Woodfield. Shiro gave officers permission to go into the home and when officers pulled up to the driveway they observed C.G. exiting Woodfield. C.G. informed officers that Shiro had just called him. C.G. was with three other individuals. Officers contacted Shiro again and asked if she was okay with them being in Woodfield, as they all had known drug histories. Shiro informed officers that C.G. had gotten in through a window and that it was fine for them all to stay as she knew them all.

16. On April 10, 2019, officers and agents conducted a controlled purchase of fentanyl with a cooperating source ("CS")[2] into T.S., an individual known by law enforcement to reside at Woodfield. T.S. exited Woodfield, entered into the CS's vehicle, and a drug transaction occurred. The CS subsequently returned T.S. to Woodfield. 1.07 grams of a brown powder was recovered from CS and subsequently tested presumptive positive for fentanyl.

17. On April 17, 2019, a second controlled purchase into T.S. was conducted with CS. The second drug transaction took place inside of Woodfield. One (1) gram of a brown powder was recovered from CS and subsequently tested presumptive positive for fentanyl.

18. On September 10, 2019, complaints from surrounding neighbors of Woodfield increased. Officers again started conducting surveillance. Neighbors reported observing a Toyota Paseo that appeared often at Woodfield and seemed to be residing at the location. The vehicle was run through Bureau of Motor Vehicles and belonged to D.W.

19. The Toyota Paseo was stopped with D.W. in the passenger seat, and a male individual, M.W., operating the vehicle. M.W. informed officers he resided at Woodfield. A subsequent search of the vehicle yielded drug paraphernalia and a crack pipe was recovered from M.W. $4000 in cash was recovered from inside the vehicle. Maine Drug Enforcement Administration informed officers that as a result of a tracking device placed on the vehicle, the vehicle had been traveling back and forth to Massachusetts.

20. On November 29, 2019, officers were dispatched to Woodfield for an overdose. Officers received a call from a third party not at Woodfield that D.W. had taken ten (10) Xanax bars and three (3) grams of heroin and was overdosing. Officers met with Jamie and C.W., a resident at Woodfield. In the officer's training and experience, they both appeared to be under the influence of drugs. Officers were directed to the basement, where D.W.'s bedroom was

---

[2] CS was providing information for nothing in return. He/she does not have any pending charges at this time.

located, and were met with a third individual, B.S., who, in the officer's training and experience, appeared to be under the influence of drugs. Officers observed Narcan on a table by D.W.'s bed with the instructions open.

21. On December 19, 2019, an officer observed a vehicle in the driveway of Woodfield and observed the vehicle speed away. The officer stopped the vehicle. The vehicle was occupied by S.D. and A.S. S.D. had active warrants and A.S. had bail conditions that included random search. A subsequent search of the vehicle yielded tin foil folds with burn marks. The occupants of the vehicle admitted to walking out of Woodfield with the foils and that B.S. was inside. There was an active warrant for B.S.

22. As a result officers knocked on the front door to Woodfield and Jamie answered the door. Jamie allowed the officers inside and B.S. was located in his/her room in the basement. B.S. admitted he/she was a drug user and was selling to maintain his habit.

23. On January 20, 2020, officers observed a vehicle in the driveway of Woodfield and observed a male exit the residence and enter into the passenger side of the vehicle. A traffic stop was initiated on the vehicle. J.B. was identified as the operator, and D.D.[3] was identified as the passenger. D.D. informed officers that J.B. had picked him up from the location. D.D. stated that his girlfriend, M.G. resided at Woodfield and paid rent for a room. D.D. further informed officers that all "kinds" of people were staying at Woodfield. D.D. admitted to spending the night at Woodfield and that he "shot up"[4] around noon inside of Woodfield. D.D. stated that Jamie, Shiro, and six (6) other individuals were residing at Woodfield.

24. A search of D.D. yielded money folded and crumpled in all of his/her pant pockets and a

---

[3] D.D. provided a false name initially.
[4] In my training and experience the term "shot up" is a street term for injecting one's self with a needle with drugs.

capped hypodermic needle in his pocket. D.D. could not explain where the money came from. D.D. also had a check written and signed by Shiro from Town and Country Bank written to D.A. for $200. J.B. admitted he/she was driving D.D. to Ruski's in Portland. Officers, through subsequent investigation, learned Ruski's was next door to where D.A. resided. A search of the vehicle yielded fentanyl located in close proximity to J.B. and was seized.

25. On January 27, 2020, officers contacted Shiro and asked her to come in to speak with them in regards to the increased activity at Woodfield. Shiro admitted she authored the check written to D.A. and provided it to Jamie. She stated she didn't know who D.A. was but wrote it under duress. Shiro admitted Jamie was out of control and Shiro wrote checks to Jamie so Jamie would not bother her at work for money. Shiro stated that Jamie was using domestic violence tactics against Shiro at the home and Shiro didn't feel safe. Shiro further stated she wrote checks to Jamie for groceries and cigarettes and further admitted when writing the check to D.A. she did not know or ask what the check was for. She thought maybe the check was for a taxi to get to the methadone clinic.

26. Shiro was shown a photo of D.D. and she denied knowing him. When officers informed Shiro that D.D. was with M.G. who was residing at her home, Shiro stated she remembered seeing him and knew his name. She further admitted she gave D.D. a ride to the mall.

27. Shiro stated she remembered receiving the email containing the maintaining a drug premises federal statute and that she had cleaned up the house. Officers went over the recent increase in activity including the recent overdose. Shiro admitted that was D.W. and that it was an intentional suicide. Officers stated that no one from inside the residence contacted police, including Shiro, and that Shiro was present in the house when the incident occurred. Officers further informed Shiro that after speaking with various people at Woodfield on the evening of

the incident, they learned no one wanted to contact police because they did not want police inside the house.

28. Officers informed Shiro that they had conducted several search warrants on phones recovered from individuals inside of Woodfield and the phones provide images of heavy drug use inside. Some of these images included drug use occurring inside of the living room. The phones further provided images of C.G. in a catatonic state and T.S. passed out with individuals unable to wake him. Shiro responded that she has seen T.S. like that and that C.G. gets wild.

29. Shiro admitted the people who live there do not pay rent and that a few weeks ago she kicked everyone out. She said that after kicking them out, a few days later they were back. She further stated after the search warrant and arrest of T.Smith, she had cleaned the house up and been "up their butts" about drug activity.

30. Shiro admitted she reads the statute on her phone many times. She stated she lets people stay because they have nowhere else to go and she has a big house. She admitted she knows all the kids and they were bad news. She informed officers that the residents state there are no drugs at Woodfield, but she hasn't believed them in the past few weeks.

31. Shiro read the statute again and an officer asked her what she thought it meant. Shiro stated "that I am in big ass trouble." She then stated that her house was down the "rabbit hole" and that she was unaware of anything going on until officers just informed her.

32. On April 24, 2020, officers observed a vehicle in the driveway of Woodfield. Officers ran the registration and learned the registered owner, C.P., had an active warrant for a probation violation. Officers conducted a traffic stop and identified the operator as C.P. and arrested him/her on the probation warrant. Post-*Miranda* C.P. admitted he/her was on probation for a drug charge. C.P. admitted he/she had just left a sober home in Gorham and learned of a room

he could rent, from a friend who was currently residing at Woodfield. C.P[5] went to Woodfield and met with Shiro and agreed to rent a room in the basement for $400.

33. In late April and early May of 2020, Scarborough police began receiving numerous complaints of increased vehicle activity at Woodfield. On May 14, 2020, officers established surveillance at Woodfield and observed multiple vehicles coming and going from the location, consistent with the complaints from neighbors.

34. On May 15, 2020, an officer observed a vehicle depart Woodfield and while following the vehicle observed a traffic violation. As a result the vehicle was stopped and three individuals including T.S. were inside the vehicle. Through surveillance and intel, T.S. has been a consistent resident of Woodfield. Upon speaking with T.S., T.S. stated that he/she and the other occupants of the vehicle were hired by Shiro to remove "junk" from the property. T.S. stated he no longer resided at the residence and was unaware of anyone residing at the residence besides Jamie, Shiro and Shiro's boyfriend. T.S. stated he was unaware of why there would be an uptick of activity at the location. The vehicle operator was issued a warning and the vehicle was released.

35. On May 18, 2020, an officer observed a vehicle arrive at Woodfield and depart approximately five (5) minutes later. A traffic stop was initiated on the vehicle and upon speaking with the operator of the vehicle, N.L., he/she admitted to smoking marijuana with C.G. at Woodfield. N.L. further admitted that he/she met C.G. approximately a month ago and that he/she had purchased methamphetamine from C.G. several times in the past month. N.L. also stated C.G. sold fentanyl along with methamphetamine, but N.L. had never purchased fentanyl from C.G. Through law enforcement surveillance and intel, C.G. is known to be a long time resident of Woodfield. N.L. was issued a warning and released.

---

[5] C.P. is currently incarcerated on a probation hold and on a new charge for spitting fentanyl in a Portland police officer's face.

36. On May 19, 2020, at approximately 4:25 p.m., I set up surveillance at Woodfield and observed an unoccupied red sedan in the driveway of Woodfield. Approximately five (5) minutes later, I observed a male walk to the vehicle and get into the driver's seat. My view was obstructed and I was unable to determine if the male came from inside the vehicle or not. I followed the vehicle and heard the vehicle had a loud exhaust and observe the vehicle rapidly accelerate to approximately 65 m.p.h. in a 40 m.p.h. zone.[6] I activated my blue lights and stopped the vehicle. While the vehicle pulled over to the side of the road, the operator was observed reaching around the vehicle. When I approached the vehicle I asked the male operator what he had been reaching for. The male had a cigarette in his hand that was nearly half way smoked. The male claimed he was searching for a cigarette.

37. I looked towards the area where the male had been reaching and observed two (2) cigarette packs in the cup-holder area in plain view. One was closed, and the other was partially opened. I could see a plastic baggie with an off-white powdery substance protruding from the opening of the cigarette pack.[7]

38. At that time, I removed the male from the vehicle and secured him in handcuffs. I advised him that he was not under arrest, but was detained and not free to leave. I patted the male down for my safety. I removed the plastic baggie from the cigarette pack and confirmed that it appeared to be fentanyl or heroin. The other cigarette pack contained an undetermined amount of U.S. Currency.

39. The male was identified as M.L., and was read his *Miranda* warnings. M.L. waived his

---

[6] I was operating an unmarked vehicle that was not equipped with a radar or speed measurement device, but I have received training in determining and manually clocking speed.

[7] Based on my training, education and experience, I am aware that drug users frequently conceal narcotics inside cigarette packs. Furthermore, I am aware of how fentanyl, heroin and other illicit drugs are commonly packaged, and am aware that it is not unusual for traffickers to package drugs in the corner of plastic baggies which are then tied off to secure the narcotics

rights and stated he contacted T.S. on Facebook Messenger and asked to come to the residence. M.L. then drove the residence and upon arriving entered through the front door of Woodfield unannounced. M.L. stated that this was not uncommon. M.L. stated he went to T.S.'s room and described the location of the room. This location matched my understanding of the interior layout of Woodfield. M.L. stated he purchased one (1) gram of fentanyl from T.S. for $100. M.L. was unaware where T.S. pulled the drugs from in the room, but watched T.S. weigh the drugs, bag them, and then tie the bag off.

40. M.L. showed me the Facebook Messenger conversation between M.L. and T.S., with the thread as follows:

> T.S.: Yooo
> T.S.: IF u swing me to meet my dude I'll hook you up with extra
> T.S.: On top of what you get
> T.S.: Chand said you would then he started bitching so I need to know what's happening
> T.S.: U can try my shit to I'll let you try it out for free
> T.S.: So you know how it really is
> T.S.: Before it leaves my room

41. When asked to explain the messages, M.L. stated that T.S. was trying to get M.L. to give him/her a ride to his source, however M.L. did not want to do that. M.L. admitted to sampling some of T.S.'s fentanyl when he conducted the drug transaction.

42. The powder in the bag from the cigarette carton was tested using a TruNarc device and tested presumptive positive for the presence of fentanyl.

43. As a result of the recent activity and drug transactions, a search warrant was applied for on the evening of May 19, 2020, to a Superior Court Judge with the State Maine. The warrant was subsequently executed in the early evening of May 19, 2020.

44. As a result of the warrant, in a room occupied by Jamie and T.S., a folded up piece of foil was recovered on a nightstand containing brown powder. This subsequently tested presumptive

positive using a TruNarc device for fentanyl compound. A second foil was located on the same nightstand containing brown powder and tested presumptive positive for fentanyl. On a second nightstand, a folded up piece of foil containing liquid with a white powder suspended in it was recovered and tested presumptive positive for fentanyl compound. In basement room one, belonging to M.S., a tin foil containing residue was recovered on the windowsill. It tested inclusive using a TruNarc device. Residue was observed on a broken piece of glass on the windowsill as well. It tested inconclusive. In C.G.'s room, basement room two, white powder folded up in foil on a desk in the middle of the room was located. It tested positive for baking soda. Another foil was located on a different desk up against wall. It tested positive for confectionary sugar.[8]

45. Inside of Shiro's bedroom marijuana in a vial, a grinder[9], a roach[10], and a marijuana smoking bowl were recovered. Shiro's checkbook register was observed and photographed with numerous checks written out to Jamie, on a near daily basis, ranging in amounts between $100-$300 for each time.

46. I spoke with Shiro privately at first and Shiro stated she was afraid of Jamie, that Jamie ran the household, and Jamie would lock Shiro in her room. I confronted Jamie, in Shiro's presence in regards to Shiro's claims and Jamie appeared to be shocked by what Shiro was asserting. Shiro then got angry with me and stood up several times. Shiro in sum and substance stated we were "assholes" and could tear apart her room and house.

---

[8] In my training and experience I know that baking soda and confectionary sugar are used as cutting agents to dilute drugs to stretch the amount out and get more value when selling.
[9] In my training and experience a "grinder" is used to grind up marijuana into small pieces in order to smoke it.
[10] In my training and experience a "roach" is the small remnants of a marijuana cigarette.

47. I spoke with T.S. in regards to the earlier drug transaction and the Facebook Messenger messages. T.S. denied any knowledge of the transaction or messages and instead provided information on two individuals he/she knew who were dealing drugs locally.

## CONCLUSION

48. I respectfully submit, based on the facts set forth above, that probable cause exists to charge Susan Shiro by Criminal Complaint with the offense of maintaining, managing and controlling the residence at 6 Woodfield Drive, Scarborough, Maine, as an owner and occupant, knowingly and intentionally made available for use, with or without compensation, said place for the purpose of unlawfully storing and distributing controlled substances, in violation of Title 21, United States Code, Section 856(b), and request that the accompanying Criminal Complaint be issued.

Andrew Flynn
Task Force Officer
U.S. Drug Enforcement Administration

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedure

Date: May 21, 2020

City and state: Bangor, Maine

Judge's signature

John C Nivison U.S. Magistrate Judge
Printed name and title